1  GORDON M. COWAN, Esq.
   SBN# 1781
2  Law Office of Gordon M. Cowan
   P.O. Box 17952
3  Reno, Nevada  89511
   Telephone 775.786.6111
4

5  Attorney for Plaintiff LAURA LEIGH

6
                    **IN THE UNITED STATES DISTRICT COURT**
7
                              **DISTRICT OF NEVADA**
8
   LAURA LEIGH,
9
                         Plaintiff,
10                                              **Case No.  3:13-cv-0006-MMD-VPC**
                         vs.
11
   SALLY JEWELL, in her official capacity as
12 Secretary of the U.S. DEPARTMENT OF
   THE INTERIOR, MIKE POST, in his official
13 capacity as Acting Director of the BUREAU
   OF LAND MANAGEMENT; AMY LUEDERS
14 in her official capacity as Nevada State
   Director of the BUREAU OF LAND
15 MANAGEMENT,

16                       Defendants.
                                            /
17 _____

                              **PROPOSED**
18

19         **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR**
                  **DECLARATORY AND INJUNCTIVE RELIEF**
20

21

22

23

24

25

26

27

28

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Exhibit 1

1   GORDON M. COWAN, Esq.
    SBN# 1781
2   Law Office of Gordon M. Cowan
    P.O. Box 17952
3   Reno, Nevada  89511
    Telephone 775.786.6111
4

5   Attorney for Plaintiff LAURA LEIGH

6
                **IN THE UNITED STATES DISTRICT COURT**
7
                        **DISTRICT OF NEVADA**
8
    LAURA LEIGH,
9
                        Plaintiff,
10                                              **Case No.  3:13-cv-0006-MMD-VPC**
                    vs.
11
    SALLY JEWELL, in her official capacity as
12  Secretary of the U.S. DEPARTMENT OF
    THE INTERIOR,  MIKE POST, in his official
13  capacity as Acting Director of the BUREAU
    OF LAND MANAGEMENT,  AMY LUEDERS
14  in her official capacity as Nevada State
    Director of the BUREAU OF LAND
15  MANAGEMENT,

16                      Defendants.
                                                    /
17
            **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR
18                  DECLARATORY AND INJUNCTIVE RELIEF**

19

20          Plaintiff LAURA LEIGH, avers as follows:

21          **AMENDED AND SUPPLEMENTAL GENERAL AVERMENTS**

22          1.      Plaintiff seeks to halt further inhumane conduct of the type demonstrated

23  at the Bureau of Land Management's ("BLM") Owyhee Complex Wild Horse Gather

24  ("Owyhee Complex roundups") in Humboldt and Elko Counties, Nevada, occurring this

25  past January 2013, and which roundups are expected to continue in the same

26  geographical region, Owyhee Complex, as is outlined and authorized under the

27  defendants' ten-year Environmental Assessment ("EA"). See Exhibit 1, Dkt. 52-2.

28          2.      Plaintiff seeks to halt a newly crafted bait / water trap method of rounding

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

up wild horses where the bait / water trap method as would be used in this region, the Owyhee Complex area, likely causes unnecessary risk of harm and risk of probable injury to captured wild horses where the captures remain unmonitored the majority of the time, even by those responsible for the welfare and safety of those horses, who are the BLM's COR employees. This planned operation is within the purview of the ten-year EA governing removal of wild horses in the Owyhee Complex area.

3.     Plaintiff seeks to halt an intended preclusion of her constitutional, First Amendment right of access to observe and report to the public the activities of the roundups in Owyhee Complex. Plaintiff challenges two methods of her preclusion from observing, as follows:

a.     historical limitations occurring previously and which are likely to repeat in the future at helicopter roundups and their related activities at Owyhee Complex; and

b.     the newly announced bait / water trap operation at Owyee Complex which precludes and forbids all public or press observation of the defendants' bait / water trap operations, and which causes these particular government operations to be conducted entirely in secrecy, afar from public scrutiny contrary to First Amendment press access notions.

4.     Plaintiff challenges the methods by which the defendants determine "excess" horses. Plaintiff challenges the method used to determine borders of Herd Management Areas ("HMAs") and upon which the defendants rely to justify removal of purported "excess" wild horses under the ten-year EA.

5.     Plaintiff challenges emergency roundups based on so called "drought emergencies," the one most recently announced as requiring the bait / water trap operation method, intended to commence August 3, 2013 at the Snowstorm HMA within the Owyhee Complex area but was subsequently cancelled by the defendants after the plaintiff filed her Motion for Temporary Restraining Order.

6.     The Owyhee Complex roundups described above are phased-in through

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

the ten-year EA which remains in progress commencing November 26, 2012 through the tenth anniversary date of November 25, 2022, and includes five (5) separate Herd Management Areas ("HMA"s) known as Little Humboldt, Little Owyhee, Owyhee, Rock Creek and Snowstorm (collectively, the "Owyhee Complex" or Owyhee Complex area and which includes "herd areas" or "HAs"). The Owyhee, Rock Creek and Little Humboldt HMAs are administered by the BLM's Elko District (Tuscarora field Office). The Little Owyhee and Snowstorm HMAs are administered by the BLM's Winnemucca District (Humboldt River Field office). See, Exhibit 1.

      7.    This complaint originally addresses several activities some of which continue or are capable of repeating and are, therefore, discussed herein. Plaintiff is informed and believes the same activity can likely repeat where the activity is authorized under the ten year EA plan (Exhibit 1 attached), an example being the following:

      a.    The original complaint addresses roundups completed, that resumed January 4, 2013 with the intended removal of 50 horses from Owyhee because of a drought emergency or "because of severely limited water sources" (i.e. drought emergency). But the drought ended when the range became flooded with early rainstorms. Drought ceased to exist on the range after December 6, 2012 and the defendants nevertheless forged on with the roundup.

      8.    This action does not seek to halt the Owyhee Complex roundups conducted in accordance with law. This action does not seek to stop roundups conducted by helicopters when implemented in accordance with law. This action seeks, among other requests for relief, to halt the inhumane treatment of wild horses during roundups, capture, corralling and transportation which, plaintiff is informed and believes, is the BLM's apparent, demonstrable, intended normal and customary practice, method and operation, employed thus far during the Owyhee Complex roundups, and which could be reasonably expected to repeat in the continuation of the

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1    Owyhee Complex roundup ten-year EA plan.

2        9.    This action also seeks to enforce Ms. Leigh's constitutional right of access

3    to view, observe, document, assess horses, against unreasonable restrictions meant to

4    preclude her from reporting and photographing government activity.

5        10.    This action also seeks to halt improper and unauthorized roundups where,

6    plaintiff is informed and believes, the reasoning and rationale purportedly justifying

7    some of the roundups in this same region are inaccurate, not factually true or accurate,

8    flawed, or that the defendants' description of range conditions, herd movement, herd

9    population and the assessment of water resources and reclamation of such, are not

10   accurately determined or ignored, or not considered, and are instead based on

11   speculation or flawed data, or outdated data, and are not reflective of what is currently

12   found in the same region. Plaintiff is informed and believes accurate data is required

13   where the defendants are only authorized to remove "excess" wild horses. Plaintiff is

14   informed and believes that "excess" wild horses is not determinable with flawed or

15   outdated data which is utilized and relied on by the defendants currently.

16       11.    Specific to paragraph 10 above, Plaintiff is informed and believes the

17   agency should have considered but failed to consider in their final decision,

18       a.    complex-wide population census data that is up-to-date and current rather

19           than census data obtained from mere HMAs and which is also stale when

20           taken the year or two previously, in determining current wild horse

21           populations to determine AML and then "excess" horses slated for

22           removal;

23       b.    historic horse range, specific and historic movement or migration of wild

24           horses from range to range or from HMA to HMA, or to and from HMA and

25           what was formerly known as HA, or, as the defendants coin the term, "off

26           HMA," and how long the horses remain in particular regions, what

27           artificially created conditions create movement, and what percentage or

28           numbers in population of wild horses actually move or migrate versus

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

those horses who remain more permanently residing in the HMA, from

which population is counted to determine AML and then "excess" horses;

c.  whether wild horse movement or migration is seasonal, and the number of

wild horses in movement or migration;

d.  historic horse range which includes HMA and HA land ("HMA" meaning

"herd management area" designated after 1974, and "HA" or "Herd Area"

which is rangeland designated, beginning in 1971 following passage of

the original Wild Free-Roaming Horses and Burros Act of 1971, 16 U.S.C.

§1331 *et seq.* ("Wild Horse Act"); and

in failing to consider the foregoing before finalizing the EA and foregoing obtaining

accurate and current range data while nevertheless intending to forge ahead to assign

population numbers to determine AML and then "excess" wild horses for removal, the

defendants actions are "not in accordance with law" or, they are agency actions that are

arbitrary and capricious, or implemented without observance of procedure required by

law, including but not limited to relevant provisions of the Administrative Procedures

Act, 5 U.S.C. §706(2)(A) and (D).

12.  Plaintiff is informed and believes the agency should have considered but

failed to consider or determine range conditions and wild horse populations existing in

locales with normally dry conditions and in failing to determine what the normally dry

range condition is in the first instance. Plaintiff is informed and believes the defendants

should have considered but failed to consider the following:

a.  what locales, areas or portions of HMAs normally experience dry range

conditions, and the horse populations that remain and otherwise survive in

normally dry range conditions, before the defendants conclude that the

condition on which they contend is a "drought" condition (which justifies

an the emergent removal of wild horses) is in truth, the typical dry range

conditions existing in the normal course in the given locale and which

nevertheless supports the population of wild horses remaining there; or in

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 5

determining the extent to which normally dry range conditions cause horses in those locales to move or migrate to a usual locale elsewhere during the normally dry range conditions that traditionally exist in the given locale, or how far horses travel in normally dry range conditions for water;

b.      current complete range data during the life of the ten-year EA rather than outdated data on which to compare normally dry range conditions, before concluding that "drought" conditions exist to justify roundups of purported "excess" wild horses on an emergent basis;

c.      what locales or HMAs have normally dry range conditions; and the populations historically supported in such conditions

d.      an objective method or approach to determining when a "drought" exists on normally dry ranges in the Owyhee Complex;

e.      when having determined a true drought condition exists in a given locale, that rain storms and snow storms promptly alleviate drought condition and voids the necessity of continuing on with emergency roundups begun and based on drought conditions which no longer exist;

f.      methods to immediately halt ongoing roundups that are emergency based when the emergency that creates the purported need for the roundup, ceases or is no longer a threat;

g.      if developing drought conditions truly exist, then every use must be limited, not just wild horses;

In not taking into account the foregoing before finalizing the EA and before removing horses, the defendants proceed "not in accordance with law" or, their action is arbitrary and capricious, or implemented without observance of procedure required by law;

13.     The Owyhee Complex roundups were temporarily suspended December 23, 2012 for the holidays and resumed early January 2013, beginning with the removal of 50 horses in the Owyhee HMA. The number of horses to be removed there (50 horses) was raised from 11 horses because of "severely limited water sources"

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1   (meaning, a purported drought emergency) in the Owyhee HMA that, plaintiff is

2   informed and believes, simply did not exist at the time. Although the range suffered

3   from limited water resources, if this were considered a drought condition in the Owyhee

4   HMA at this point, the condition was alleviated when the range became flooded with

5   early winter storms. The drought emergency ceased to exist beginning with these early

6   heavy rains; even so, the defendants continued on with an emergency-type roundup

7   based on "drought" conditions that no longer existed. Plaintiff is informed and believes,

8   because the agency should have considered but failed to consider in their final decision

9   the data and facts as heretofore mentioned, that the removal of the horses at that time

10  was, accordingly, "not in accordance with law" or, was agency actions that was arbitrary

11  and capricious, or implemented without observance of procedure required by law.

12  Plaintiff is informed and believes, since the final EA extends over the course of ten

13  years, Exhibit 1, that instances such as this are capable of repeating throughout the life

14  of the EA.

15         14.    Plaintiff is informed and believes the following: the BLM would use the

16  same leadership and supervision for all Owyhee Complex roundups whether occurring

17  in the BLM Winnemucca District or the BLM Elko District; that Melanie Mirati, a

18  BLM-employed Wild Horse and Burro Specialist, is the chosen COR / PI for the

19  Owyhee Complex roundups; and Alan Shepard, the BLM-employed State lead for

20  Nevada's Wild Horse and Burro Program, is the other chosen COR / PI for the Owyhee

21  Complex roundups; that Ms. Mirati and Mr. Shepard are indicated as such in the BLM's

22  final EA (Exhibit 1). Plaintiff is informed and believes, where the same leadership is

23  anticipated over the EA's ten-year course as what has been observed in roundups at

24  Owyhee Complex thus far, plaintiff can reasonably expect to observe the same conduct

25  that would be "not in accordance with law" or, agency action that is arbitrary and

26  capricious, or implemented without observance of procedure required by law, in future

27  roundup operations.

28         15.    Regarding the Snowstorm HMA wild horse removal plan, Plaintiff is

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

informed and believes:

a.  BLM intended to commence a bait / water trap operation at the Snowstorm HMA beginning August 3, 2013 to set up panels such that roundups could commence August 10, 2013 and continue the 60 days thereafter;

b.  Snowstorm HMA is located in the southwestern portion of the Owyhee Complex. The Snowstorm HMA encompasses 103,644 acres of public lands and 13,465 acres of private land;

c.  the defendants intended to remove 340 wild horses with a bait / water trap method;

d.  the defendants' current justification to remove the Snowstorm horses is based on either one or two population surveys of the Snowstorm HMA, both of which are outdated and do not reflect current range conditions or current wild horse populations; a survey conducted two year past, in May 2011 estimates the population at 577 horses while the survey completed in September 2012 estimates the population at 537 horses; but no current data is available to determine an accurate, permanent population at the entire Snowstorm HMA; and also, not even minimal data has been gathered to count horses that may be found distributed throughout the complex currently;

e.  the EA (Exhibit 1) acknowledges there is dynamic movement or migration of horses between the HMAs in the Owyhee Complex, Snowstorm included; but the defendants do not take into account this acknowledged dynamic movement or migration when determining AML or "excess" horses for future roundups, the intended Snowstorm roundup being the most recent example;

f.  that when these two prior "static" surveys or snapshot moments were completed (May 2011 and September 2012), the defendants did not

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

determine the actual resident population, nor the change in population, based on movement or migration that the defendants acknowledge occurs (Exhibit 1), and the defendants never determined how many horses historically remain in Snowstorm at any given period or season, nor did the defendants determine if there is even a permanent population that remains in Snowstorm; that the permanent population of horses in Snowstorm, if any, is an unknown number  or "unknown quantity" currently;

g.    the defendants did not consider the foregoing, nor did the defendants engage in any method to determine the nature, timing or extent of the movement or migration of horses, between and among HMAs in the Owyhee Complex, the Snowstorm HMA included, before entering their final EA Exhibit 1;

h.    the defendants' recently announced Snowstorm horse roundup, to round up 340 wild horses with a bait / water trap method, relies on no basis in fact in regard to the population of Snowstorm horses existing there currently where the true wild horse population is not known, the true AML for Snowstorm is not known, the movement or migration of horses in and out of Snowstorm is not known, the true number of "excess" horses, if any, remains unknown; and where the prior surveys did not consider dynamic movement or migration of horses coming and going from Snowstorm (although the fact of movement is acknowledged in the defendants' EA), that those surveys are likewise not accurate in determining true population of wild horses existing at Snowstorm at the time those surveys were completed, and reliance on those surveys is likewise flawed;

I.    the announced roundup at Snowstorm is likely to repeat at other HMAs in the Owyhee Complex and also likely to repeat at Snowstorm in the future

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1   throughout the ten year EA; and

2   the agency should have considered but failed to consider the foregoing before finalizing

3   the EA, and when nevertheless intending to proceed with the removal of wild horses

4   from the Snowstorm HMA, the defendants proceed "not in accordance with law" or,

5   their action is arbitrary and capricious, or implemented without observance of procedure

6   required by law;

7         16.    Specific and in addition to the foregoing, with respect to the Snowstorm

8   HMA and planned roundup operation, Plaintiff is informed and believes, before

9   finalizing their EA Exhibit 1 the agency should have considered but failed to consider or

10   determine,

11       a.    accurate herd counts to determine AML or "excess" horses;

12       b.    actual movement or actual migration in population numbers, and in what

13              times of year or seasons the migrations or movement occurs, of wild

14              horses from adjacent HMAs in the same Owyhee Complex;

15       c.    accurate herd count of a permanent population, if any, that might exceed

16              AML;

17       d.    causes of movement or migration of wild horse herds and whether the

18              movement or migration is seasonal;

19       e.    the extent of dynamic herd movement or migration of wild horses;

20       f.    an accurate method of determining future herd populations when

21              considering a ten-year EA for the removal of horses during that period;

22       g.    ongoing surveys; and

23   when nevertheless not taking these factors in consideration before finalizing the EA and

24   also, when intending to proceed with the removal of wild horses from the Snowstorm

25   HMA beginning approximately August 10, 2013 to remove 340 horses, the action is "not

26   in accordance with law" or, the intended action is arbitrary and capricious, or

27   implemented without observance of procedure required by law.

28       h.    The trap was set August 1. The roundup was canceled about August 19

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1  after plaintiff's Motion for Temporary Restraining Order had been filed,

2  and without due regard of reasonably notifying the public.

3      17.  On July 25, 2013, the plaintiff personally completed a range review tour of

4  the Snowstorm HMA with a BLM official. The plaintiff's "draft" report of her findings is at

5  **Exhibit 6** attached ("Drought Monitoring Report"). Plaintiff provided a copy of the report

6  to the BLM.

7      18.  The previously intended removal of 340 horses from the Snowstorm HMA

8  is based on a purported drought emergency. Based on plaintiff's and another observer's

9  personal observation, there is no drought emergency and horses found in this region,

10  appear healthy and well nourished, which are contra-indications to a purported drought

11  emergency. Plaintiff is informed and believes the purported drought emergency does

12  not exist. When the defendants intend to proceed with the removal of wild horses from

13  the Snowstorm HMA beginning about August 10, 2013 through the next 60 days

14  thereafter, to remove 340 horses, the action is "not in accordance with law" or, the

15  intended action is arbitrary and capricious, or implemented without observance of

16  procedure required by law. When the defendants should have considered but failed to

17  consider before finalizing the EA, that current, accurate range conditions and current,

18  accurate conditions of horses should be determined before proceeding with roundups

19  at Snowstorm and other HMAs in the Owyhee Complex, before determining that horses

20  should be removed based on emergency drought which in truth does not exist, the

21  action is "not in accordance with law" or, the intended action is arbitrary and capricious,

22  or implemented without observance of procedure required by law.

23      19.  Artificial boundary lines of HMAs do not take into consideration the natural

24  and historical movement of horses to water sources. Plaintiff is informed and believes

25  when artificially placed boundary lines are not aligned to encompass water sources or

26  watering holes that have been traditionally used by the wild horses, that wild horses

27  traveling to those water sources after HMA boundaries are artificially determined, are

28  improperly considered by the defendants as traveling "off HMA" (a BLM-coined phrase)

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 11

1  and thus are improperly slated for removal because they are seen or found outside the

2  arbitrarily assigned boundary line of the HMA, even though these same watering holes

3  are part of the horses natural and traditional movement in finding and using these same

4  water sources before the artificial boundary lines were drawn, and which water sources

5  were included in boundary lines in 1971 following the passage of the Wild Free

6  Roaming Horse and Burrow Act (referenced below); and unknown to the horses, they

7  crossed the line, an artificial one in this instance, which slates them for removal from

8  their habitat that the same herds have been using long before these arbitrary boundary

9  lines were drawn. The defendants should have considered but failed to consider this

10 conceptual flaw before finalizing their EA, and the intended removal of the horses found

11 "off HMA" who traveled to traditionally used watering holes or water sources, is action

12 "not in accordance with law" or, the intended action is arbitrary and capricious, or

13 implemented without observance of procedure required by law.

14       20.     The agency should have considered but, before finalizing the EA, failed to

15 consider or determine,

16       a.     the natural and historic movement of wild horses to and from water

17              sources in and around the Owyhee Complex;

18       b.     that not taking into account the natural and historic movement of wild

19              horses to and from water sources before drawing arbitrary HMA lines, that

20              horses could be reasonably expected to travel beyond artificially created

21              HMA lines when traveling to and from those water sources and watering

22              holes that were included in boundary lines in 1971 when considered

23              traditional horse ranges then;

24       c.     in the instance of the Snowstorm HMA, the water source in question is

25              less than one-quarter mile from the defendants' arbitrarily re-set boundary

26              line of the Snowstorm HMA boundary; and

27 the intended removal of the horses found "off HMA" (BLM coined phrase) who traveled

28 to traditionally used watering holes or water sources, particularly in years of low

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 12

precipitation, is action "not in accordance with law" or, the intended action is arbitrary and capricious, or implemented without observance of procedure required by law.

21. The intended removal of 340 horses from the Snowstorm HMA is based on a purported drought emergency. The defendants intend to remove these horses with a bait / water trap operation. But the bait / water trap operation, meant to capture the horses over a sixty-day period rather than on an emergent, swift method, is the testament to the fact that there is no emergency. If a true emergent drought existed or horses were not in healthy shape, the BLM would be rounding up horses immediately through more expedient means rather than taking horses casually through the extended course of 60 days via a bait / water trap method. The agency should have considered but, before finalizing the EA, failed to consider or determine, that,

a. a casual 60 day time period to remove horses purportedly based on a drought emergency, is neither appropriate nor effective;

b. the method of bait / water trapping of wild horses used to remove horses purportedly based on a drought "emergency," is neither appropriate nor effective; and

the intended removal of the horses because of a purported drought emergency that does not truly exist, and the use of bait / water trap methods to remove horses on an emergency drought basis, are agency actions "not in accordance with law" or, the intended action is arbitrary and capricious, or implemented without observance of procedure required by law.

22. Although emergent drought conditions are claimed as the reason to remove horses found at Snowstorm, the defendants never curtailed or halted grazing livestock from the same region. Also, new or expanding mining operations are being allowed in Snowstorm which also uses significant water in the same region for its operation. That if removal of wild horses was necessitated by a true drought emergency, it would appear reasonable and necessary that livestock grazing in the same region as the areas claimed to have been stricken with drought, would have also

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 13

1  been curtailed during the purported emergency drought condition; and that if true

2  drought emergency conditions were present, that new mining operations and existing

3  operations that consume significant amounts of water from the same region, that they

4  too would be curtailed during drought emergencies; and that grazing animals such as

5  cattle share the impact on the area as much as do wild horses, and mining operations

6  consume considerable water resources over that of grazing animals. The defendants

7  should have considered but failed to consider such facts before finalizing the EA, that

8  when finding it necessary to remove only wild horses but not curtail other users of the

9  same rangeland, in this case, the Snowstorm HMA, the defendants action is "not in

10 accordance with law," or is arbitrary and capricious, or implemented without observance

11 of procedure required by law.

12      23.    The defendants should have considered but failed to do so before

13 finalizing the EA, that when calling for emergent drought conditions as reason to

14 remove wild horses, that all grazing animals controlled by their human owners should

15 be halted and curtailed as well, in the same HMA, Snowstorm in this instance, as the

16 areas where the defendants contend horses should be removed. And, in not taking into

17 account the foregoing before finalizing the EA which causes the removal of those

18 horses that may be found at Snowstorm, the defendants actions are"not in accordance

19 with law" or, their actions are arbitrary and capricious, or are implemented without

20 observance of procedure required by law.

21      24.    All horses observed at Snowstorm during the plaintiff's tour July 25, 2013

22 were found in good shape and in good health. The health and condition of these horses

23 remains a clear indication that there is no emergent drought condition to justify a

24 roundup. Plaintiff is informed and believes the defendants should have considered but

25 failed to consider before finalizing the EA, that horses to be removed based on

26 emergency drought conditions should not be removed when found in good condition on

27 the range just prior to the purported emergent roundup, and failing to do so, the

28 defendants action is "not in accordance with law," or is arbitrary and capricious, or

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1    implemented without observance of procedure required by law.

2          25.    Plaintiffs' observations during her July 25, 2013 tour demonstrates that

3    the defendants' contention that the number of horses claimed by the defendants to be

4    "excess" or above AML in Snowstorm, is not true. On July 25, 2013, plaintiff saw very

5    few horses, noting their count and location in her report. Few horses were found and

6    certainly, there were far fewer than that which the defendants suggest must be removed

7    as excess horses. Plaintiff is informed and believes, before finalizing their EA the

8    defendants should have considered but failed to consider or determine,

9          a.    accurate herd counts to determine AML or "excess" horses;

10         b.    actual movement or actual migration in population numbers, and in what

11               times of year or seasons the migrations or movement occurs, of wild

12               horses from adjacent HMAs in the same Owyhee Complex;

13         c.    accurate herd count of a permanent population, if any, that might exceed

14               AML;

15         d.    causes of movement or migration of wild horse herds and whether the

16               movement or migration is seasonal;

17         e.    the extent of dynamic herd movement or migration of wild horses;

18         f.    an accurate method of determining future herd populations when

19               considering a ten-year EA for the removal of horses during that period;

20         g.    ongoing surveys; and

21   when nevertheless not taking these factors in consideration before finalizing the EA and

22   also, when intending to proceed with the removal of wild horses from the Snowstorm

23   HMA beginning about August 10, 2013 to remove 340 horses, the action is "not in

24   accordance with law" or, the intended action is arbitrary and capricious, or implemented

25   without observance of procedure required by law. Also, where the defendants continue

26   to proceed with rounding up horses from Snowstorm while aware of Ms. Leigh's and

27   others' recent observations of Snowstorm that the population contended by the

28   defendants to be there, is simply not there currently,  the defendants action is "not in

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1  accordance with law," or is arbitrary and capricious, or implemented without observance
2  of procedure required by law.

3      26.    Plaintiff is further informed and believes, in view of the foregoing, the
4  defendants did not take into consideration the dynamic change in wild horse
5  populations and range conditions within the Owyhee Complex when adopting and
6  finalizing a ten-year process through their final EA, they did not take into consideration
7  before finalizing the EA, true relevant factors likely to occur in the future of the plan (i.e.
8  within the next several years of the ten year EA); and in failing to consider and
9  accommodate dynamic and changing wild horse populations and range conditions
10  occurring in future years of the ten-year EA, the example being the substantial
11  differences in population of Snowstorm found July 25, 2013 versus the surveys of
12  populations occurring more than a year and two previously, that the defendants have
13  made clear errors of judgment in finalizing a ten-year EA and also in following through
14  with roundup horses at Snowstorm where in truth, there is no emergent need, there are
15  no excess horses there, and the horses there are in good health and condition.

16      27.    The Snowstorm HMA roundup is a water / bait trap operation not
17  supervised by anyone other than by the contractor or just occasionally by BLM's COR.
18  Plaintiff is informed and believes the terms "COR"  or "PI" are BLM acronyms for those
19  employed by the BLM (not independent contractors) who are designated as the
20  "Contracting Officer Representative" and "Project Inspector" for roundup operations.
21  The BLM's COR personnel are charged with the responsibility of ensuring that horses
22  handled by their chosen contractor are treated humanely at all times.  But the EA limits
23  the BLM COR's participation during bait / water trap operations to only 20 percent of the
24  time, meaning the remainder of the time, 80 percent of the operation, the handling of
25  wild horses would remain un-monitored except by the chosen contractor - the very
26  person whose monitoring is required by BLM's COR. The BLM's COR remains
27  responsible for monitoring humane care and treatment of wild horses handled by the
28  contractor.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

28.     After advising the public the Snowstorm roundup would proceed, the Snowstorm roundup was cancelled. The defendants canceled the roundup about 19 days after the defendants began setting up horse traps, which was two days prior to the court's hearing August 21, 2013 on the plaintiff's Temporary Restraining Order motion.

29.     Plaintiff is informed and believes the defendants should have considered but failed to consider before finalizing the EA, that leaving the handling and humane care of wild horses during roundup operations to the very entity / individuals whose monitoring for humane handling is required, potentially places wild horses slated for capture and removal, in jeopardy and to potential inhumane treatment; and the process prevents the BLM from accurately monitoring the capture and removal of wild horses by 80 percent of the time; and the process prevents the BLM from independently verifying and reporting to the public with any accuracy, except by, perhaps 20 percent, the number of horses removed, the number of horses injured, the number of horses destroyed and whether wild horses were captured, handled and shipped "humanely." Accordingly, in failing the foregoing, the defendants action is "not in accordance with law," or is arbitrary and capricious, or implemented without observance of procedure required by law. The plaintiff is further informed and believes that the defendants have made clear errors of judgment in finalizing a ten-year EA and also in proceeding with roundups in accordance with the EA when not having taken into consideration these concerns.

30.     The National Academy of Sciences report released to the pubic June 6, 2013 (i.e., this year) reaffirms the plaintiff's concerns relative to the foregoing alleged lack of data upon which the defendants rely, leading the defendants to inappropriate decisions relative to the rounding up of wild horses from the Owyhee Complex. The National Academy of Sciences Report ("NAS report" or "NAS study"), entitled, Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward, can be found at the following web link:

http://dels.nas.edu/Report/Using-Science-Improve/13511. Plaintiff is informed and

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 17

believes the entire report consists of about 450 pages which is beyond that allowed as

a document to be filed with the court absent special permission. Plaintiff asks that the

court allow its filing, to take judicial notice of the NAS report as an official, government

authorized report following a requested study or investigation made pursuant to

authority granted by the defendants according to law. If the NAS report is not filed with

this pleading, the plaintiff has no objection to the court considering the NAS report as

one outside the pleadings, if not made part of the record.

      31.    Plaintiff is informed and believes the defendants requested the NAS

study, that the NAS study cost the government in excess of $1.5 million, it took two

years in the making and was completed by 14 top experts and scientists.

      32.    Plaintiff is informed and believes, that some of the findings of the NAS

study, relative to the defendants' management of wild horses and which are relevant to

the allegations herein, confirm the plaintiffs concerns and allegations, and include but

are not limited to the following:

      a.    The Wild Horse and Burro Program has not used scientifically rigorous

methods to estimate the population sizes of horses and burros, to model

the effects of management actions on the animals, or to assess the

availability and use of forage on rangelands, even though science-based

methods exist for improving population estimates and predicting the

effects of management practices in order to maintain genetically diverse,

healthy populations, and estimating the productivity of rangelands;

      b.     Management of free-ranging horses and burros is not based on rigorous

population-monitoring procedures. At the time of the committee's review,

most Herd Management Areas did not use inventory methods or statistical

tools common to modern wildlife management. Survey methods used to

count animals were often inconsistent and poorly documented and did not

quantify the uncertainty attached to counts;

      c.    On the basis of information provided to the committee, the statistics on

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 18

1  the national population size cannot be considered scientifically rigorous.
2  The links between BLM's estimates of the national population size and its
3  actual population surveys   the data that underlie these estimates   are
4  obscure. The procedures used to develop population estimates for the
5  Herd Management Areas from counts of animals are not standardized
6  and frequently not documented. It seems that the national statistics are
7  the product of hundreds of subjective, probably independent judgments
8  and assumptions by range personnel about the proportion of animals
9  counted during surveys, population growth rates, and other factors. As a
10  result BLM's reported annual population statistics, which are based on the
11  assumption that all animals are detected and counted, probably
12  underestimate the actual number of animals on the range;
13  d.   Management practices are facilitating high rates of population growth.
14  Free-ranging horse populations are growing at high rates because BLM's
15  removals hold populations below levels affected by food limits. If
16  population density were to increase to the point that there was not enough
17  forage available, it could result in fewer pregnancies and births and lower
18  young-to-female ratios and survival rates. Decreased competition for
19  forage through removals may instead allow population growth, which then
20  drives the need to remove more animals;
21  e.   Management of horses and burros as metapopulations is necessary for
22  their long-term genetic health. Genetic studies of horses on 102 Herd
23  Management Areas show that the genetic diversity for most populations is
24  similar to those of healthy mammal populations, although genetic diversity
25  is not static and could change over time. Little is known about the genetic
26  health of burros; the few studies that have been conducted reported low
27  genetic diversity compared to domestic donkeys. To achieve an optimal
28  level of genetic diversity, managers could consider the collective

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1  populations of several Herd Management Areas as a single population.

2  Management options include intensively managing individuals according

3  to their genetic makeup within Herd Management Areas, translocating

4  horses and burros among these areas, or both;

5  f.   The Wild Horses and Burros Management Handbook lacks specificity.

6  Issued by BLM in 2010, the handbook provides some degree of

7  consistency in goals, allocation of forage, and general habitat

8  considerations. Currently the handbook lacks the specificity needed to

9  adequately guide managers on establishing and adjusting Appropriate

10  Management Levels   the number of horses and burros BLM deems

11  appropriate for a given Herd Management Area . It does not provide

12  sufficient detail on how to conduct various kinds of assessments. In

13  addition, the handbook does not clarify the important legal definitions

14  related to implementing and assessing management strategies for

15  free-ranging horses and burros, leaving these concepts uninformed by

16  science and open to multiple interpretations.

17  Plaintiff is informed and believes the bottom line of the NAS study is that the

18  defendants' management of wild horses, including those in Owyhee Complex and

19  Snowstorm HMA, is not based on science, although it should be, and that the

20  defendants lack data to make informed decisions concerning horses' removal, make

21  decisions subjectively, make decisions which adversely effect herd population contrary

22  to the desired effect of reducing the quantity of wild horses and the defendants make

23  decisions which adversely effect genetic viability of wild horse herds.

24  33.   The defendants should have considered but failed to consider before

25  finalizing the EA, the facts and conclusions as outlined herein in the NAS report long

26  before an expensive study became necessary to tell the defendants the obviously bleak

27  facts of the defendants' management of wild horses on public lands, including the

28  defendants' management of wild horses in the Owyhee Complex. Accordingly, in failing

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

the foregoing, the defendants action is "not in accordance with law," or is arbitrary and capricious, or implemented without observance of procedure required by law. The plaintiff is further informed and believes that the defendants have made clear errors of judgment in finalizing a ten-year EA and also in proceeding with roundups in accordance with the EA when not having taken into consideration these concerns as have been outlined and confirmed by the NAS report.

34.    The defendants conduct toward wild horses observed at roundups at the Owyhee Complex and which is described more specifically in the original complaint and below, demonstrates an "as practiced" low regard for the wild horses the defendants capture and seek to capture, appearing to cause wild horses to be handled inhumanely. The defendants in their EA acknowledge that horses shall be handled humanely although in practice during roundups, this does not occur. The Wild Free Roaming Horse and Burro Act mandates "humane" handling of wild horses. In the preamble of the Wild Free Roaming Horse and Burro Act, Congress's policy is stated clearly that wild horses shall be protected from capture, branding, harassment or death and to accomplish this, wild horses are to be considered as an integral part of the natural system of public lands. In regard to the humane handling of wild horses that are targeted for removal from the Owyhee Complex, and as but a few examples, the defendants should have considered but failed to consider before finalizing the EA,

    a.    adopting a uniform standard of care or specific, enforceable rules that ensure and promote the humane handling of wild horses during the roundup, capture, holding, storing, transportation and disposition ("roundup activities") of wild horses in the Owyhee Complex;

    b.    adopting specific methods to avoiding the harassment and death of wild horses in the Owyhee Complex, occurring during roundup activities; and in failing the foregoing, the defendants action is "not in accordance with law," or is arbitrary and capricious, or implemented without observance of procedure required by law.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 21

35.    The defendants intend to conduct the Snowstorm HMA roundup in a cloak of secrecy, afar from public and press and Ms. Leigh's observation by denying all public observation of roundup activity occurring as bait / water trap operations in the Owyhee Complex beginning with the Snowstorm HMA roundups. The defendants should have considered but failed to consider before finalizing the EA,

    a.    that continuing to prohibit public observation in the manner that had taken place previously in both Owyhee Complex and elsewhere before finalizing the EA, and in intending to completely eliminate public observation and the plaintiff's observation of bait / water trap roundup operations in the Owyhee Complex, including the Snowstorm HMA, that doing so violates Ms. Leigh's and the public's and other credentialed press's constitutional First Amendment right of access to observe government activity. See, e.g., Leigh v. Salazar, 677 F.3d 892 (9th Cir. 2012).

    b.    that public observation is successfully employed and permitted in other bait / water trap operations elsewhere, conducted on BLM lands;

    c.    that Ms. Leigh and other members of the public and/or press have personally observed ongoing bait / water trap operations of wild horses on BLM lands;

in not taking into account the foregoing before finalizing the EA which causes the removal of those horses that may be found at Snowstorm, the defendants would proceed "not in accordance with law" or, their action would be arbitrary and capricious, or implemented without observance of procedure required by law.

36.    The defendants' intended preclusion and ongoing preclusion of the plaintiff from having access to observe roundup activities, to observe the handling of horses during roundups, corralling, shipment, temporary holding, and the defendants' preclusion of the plaintiff and the public from observing horses close enough so as to independently assess the condition of horses when they are captured and handled by the defendants or their chosen contractor(s), has violated and continues to violate the

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 22

plaintiff's and others constitutional First Amendment right of access. The defendants' conduct also violates the plaintiffs' right to observe and report to the public what transpires with respect to the government activities the plaintiff seeks to observe as a credentialed member of the press, in derogation of the First Amendment freedom of the press. Plaintiff is informed and believes the defendants' interference with the Plaintiff's constitutional First Amendment freedoms, is unlawful.

37.    Plaintiff is informed and believes the BLM's conduct toward wild horses observed during the Owyhee Complex roundups thus far, appears to be the "the norm," or is observed as the BLM's usual custom and practice in place when rounding up, capturing, corralling and transporting wild horses during the Owyhee Complex roundups. Plaintiff, accordingly, maintains a reasonable expectation that the inhumane conduct observed toward wild horses at these roundups thus far, would likely repeat in subsequent phases of the Owyhee Complex roundup including that which would begin January 4, 2013.

38.    This suit addresses multiple issues. Demonstrated uses of purported emergency to either expand or justify an action and then in the case of Snowstorm abandon that action without any note to the purported emergency that created the action and a failure to notify the public in a timely manner.

39.    This suit also addresses conduct observed at the Owyhee Complex roundups thus far, repeating nearly daily, which included the following:

a.    Routine (i.e. repeated and non-emergent) "hot shot" (cattle prod) or electric prod use on wild horses during their corralling and transport, including the use of electric prods on young horses (foals, weanlings and yearlings);

b.    driving by helicopter, wild horses through barbed wire fence lines, thus subjecting wild horses to unnecessary injury, trauma or death;

c.    rushed and aggressive loading from the trap site into trucks, subjecting captured wild horses to unnecessary trauma or injury;

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

d.   unsafe locations for trap sites where horses repeatedly (meaning day after day at the same site) crash or tumble into an unsuspecting ditch close to the trap site, where the fallen horses, usually foals or younger horses, are trampled by their companions when groups of horses are chased toward the mouth of the trap, subjecting all horses to unnecessary injury or trauma;

e.   foals less than six months weaned from their mothers at the trap;

f.   foals unable to keep up with the drive because of distance or speed. In one instance, a foal came in draped over a horse rider's saddle horn, clearly exhausted; and the same foal was carried off the trailer after having been transported to temporary holding;

g.   horses chased at a gallop pace in sub-freezing temperatures where daytime temperatures hovered in the teens and twenties in Fahrenheit.

h.   pilot flew helicopter in significant winds, demonstrating difficulties in controlling the movement of horses;

40.   The offensiveness with these issues stems from the following: the conditions existing and methods employed which unnecessarily endanger these horses, although known to BLM officials, repeats without corrective action. The BLM either dismisses the issue or justifies the conduct, or simply ignores the condition or method, refusing to take corrective action. The BLM's "bury the head in the sand" or, "justify rather than do something about it" approaches to these inhumane methods and conditions, subjects wild horses, day after day, time after time, to conditions and methods that are dangerous to the horses, absent corrective action by BLM's COR.

41.   More than a year and a half past, in a case that raised inhumane conduct by the BLM, the defendants promised this court in hearing in Leigh v. Salazar, 3:11-cv-608, that the defendants intended to put in place a humane care standard or policy, to help protect horses targeted for roundups in the future, from inhumane conditions and methods that had been observed repeatedly in previous roundups. The

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

BLM even presented the court a document at hearing, the BLM labeled its Intention

Memorandum ("IM"), stating further the BLM intended to adopt the document as policy,

for Nevada roundups, shortly. Plaintiff is informed and believes these prior statements

to the court and the document the BLM presented, were made to placate the plaintiff

and perhaps to lessen the impact of an adverse ruling from the court, rather than to

truly cause change to the methods the BLM employed. Even the document the BLM

presented to the court at hearing in Leigh v. Salazar , 3:11-cv-608, acknowledges that

corrections were necessary for humane handling reasons. The court appeared

convinced at the time, that the BLM had the best interests of the horses in mind when

the BLM came to court armed with its  proposed humane care policy to be adopted

shortly for roundups in Nevada. The court accorded the agency the benefit of the doubt.

Where, as of this date, no humane care policy has been implemented thus far, despite

statements and documents presented to the contrary, Plaintiff is of the impression the

BLM does not have the best interests of the horses in mind. Otherwise, a policy would

have been adopted and followed at this point. Otherwise, the Plaintiff would not have

found it necessary to bring this suit because of the repeated and continued inhumane

conditions and methods she observed repeatedly at recent Owyhee Complex roundups.

42.    Plaintiff acknowledges the court cannot force a government agency to

adopt standards for its methods. Rather, Plaintiff seeks only to cause correction of that

which the agency refuses to correct where the methods and conditions employed are

not humane toward the wild horses, in violation of relevant laws.

43.    For the foregoing reasons, the Owyhee Complex roundup has been

conducted inhumanely thus far, in contravention of law, in contravention of the CFRs, in

contravention of the Defendants' own established regulation or order as determined in

its Environmental Assessment ("EA") for the Owyhee Complex roundup, and also in

contravention of established norms of "humane" treatment. And, there is no indication

the BLM would change course or alter plans from that allowed at the previous Owyhee

Complex roundups, to correct inhumane methods of rounding up, corralling and

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

transporting wild horses at upcoming Owyhee Complex roundups.

44.    Where the Owyhee Complex roundup is conducted contrary to the BLM's own published EA for the Owyhee, and contrary to 16 U.S.C. §1333(b)(2)(iv)(B) for the humane removal of wild horses, and contrary to the definition of what the United States considers "humane" as is defined at 43 CFR §4700.0-5, and against reasonable notions of what is considered "humane" including those defined by the Laws of the State of Nevada, the Defendants' action in refusing to enforce its own established regulation, order or decision, or in refusing to enforce its own EA, or in refusing to enforce regulations and laws of the United States for the humane treatment of wild horses removed by the Defendant at the Owyhee Complex, is arbitrary, capricious, it amounts to an abuse of discretion, it is otherwise not in accordance with law, or it is implemented without observance of procedures required by law, including relevant provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A) and (D).

45.    That, the "Defendants' action" or "agency action" as used or referenced herein, includes the definition ascribed to "agency action" at  5 U.S.C.  §551(13) as that term is intended in connection with Section 706(2) of the APA and which includes but is not limited to the Defendants' "failure to act" to enforce its own regulations and to enforce the laws of the United States which, in this case, concerns the humane removal of wild horses at the Owyhee Complex roundups; and also the unauthorized removal of the 50 horses from the Owyhee HMA.

46.    Each of the Owyhee Complex roundups are too short in duration to allow full litigation before the roundups cease. The Defendants would claim on cessation of the roundup, as they have on several occasions in the past when faced with litigation over a roundup, that the end of roundup activity "moots" all issues raised herein, leaving Plaintiff without justice and without remedy. Plaintiff is informed and believes where the roundups are to continue in the same fashion and method employed thus far, over the next ten (10) years, that the cessation of one phase would not moot the case where the EA contemplates a ten (10) year removal plan, where the BLM intends on returning to

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

these same areas within the Owyhee Complex. See, *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012).

47.    Plaintiff and others personally observed the inhumane conditions discussed herein. Plaintiff was present for the roundups from November 27, 2012 through December 15, 2012. Plaintiff is planning on being present at most all roundups occurring at the Owyhee Complex.

48.    Plaintiff and others have been subjected to perceptible harm when observing the same inhumane conditions and methods employed, the same arbitrary, capricious and abuses of discretion by the Defendants at the first phase of the Owyhee Complex roundups. Because Plaintiff intends to be present at most of the upcoming roundups there, Plaintiff reasonably expects, without corrective action, she would be subjected to more perceptible harm in observing the same inhumane conditions and methods employed.

49.    Because the BLM repeatedly thus far,  (a) chooses not to operate with a clearly defined humane care policy for the Owyhee Complex roundups, demonstrated by the BLM's lack of recognition that the issues herein described would be considered by the common man, let alone professionals, as inhumane treatment of the Owyhee Complex wild horses rounded up thus far, (b) refuses to acknowledge and then enforce laws requiring "humane" removal of horses from public lands at the Owyhee Complex, © refuses to take corrective action to enforce the "humane" removal of wild horses from public lands in accordance with 16 U.S.C. §1333(b)(2)(iv)(B) as interpreted by 43 CFR §4700.0-5 at the Owyhee Complex roundups, the Plaintiff reasonably expects she would likely be subjected to observing the same arbitrary, capricious, unlawful, inhumane activity at the remaining Owyhee Complex roundups that she observed thus far, particularly where the same COR and chosen contractor remain to conduct, oversee and supervise remaining roundups there, and where Messrs. Miller and Seidlitz oversee and approve the roundups.

50.    The Defendants at the Owyhee Complex roundups, employ methods

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 27

1   contrary to clear public policy of the United States of America relative to management

2   practices of wild horses where such practices are mandated by 16 U.S.C.

3   §1333(b)(2)(iv)(B) as interpreted by 43 CFR 4700.0-5, to be conducted humanely. See,

4   The Wild Free-Roaming Horses and Burro Act of 1971.  ("Wild Horse and Burro Act" or

5   "WHBA").  See, P.L.92-195, 16 U.S.C. §1331 et. seq.  That 16 U.S.C. §1333 requires

6   the Defendants to roundup only excess wild horses in a mandated order of preference,

7   and the Defendants must do so "humanely."  See, 16 U.S.C. §1333 (b)(2)(iv)(B).

8                           **JURISDICTION AND VENUE**

9           51.    Jurisdiction of this matter, involving a federal question, is governed in

10   accordance with 28 U.S.C. §1331.  Relief is sought under applicable provisions of the

11   Administrative Procedures Act, 5 U.S.C. §701 et seq.

12          52.    Venue remains proper in the Northern Division of the District of Nevada

13   pursuant to 28 U.S.C. §1391(a) where the roundup which gives rise to the matters

14   asserted herein are occurring and causing an effect within the northeastern portion of

15   the State of Nevada on public lands.

16                           **PLAINTIFF AND STANDING**

17          53.    The court in this very case has already recognized Plaintiff LAURA

18   LEIGH's ("Ms. Leigh") standing to bring this suit.

19          54.    Ms. Leigh maintains standing under 5 U.S.C. § 702 of the Administrative

20   Procedures Act to seek judicial review of the BLM's action (or failure to act) where she

21   has suffered and would continue to suffer actual injury or injury in fact that is within the

22   zone of interests protected by the relevant federal statutes indicated herein which

23   Defendants fail and refuse to enforce. The Administrative Procedure Act allows a party

24   "suffering legal wrong because of agency action, or adversely affected or aggrieved by

25   agency action" to seek judicial review.  5 U.S.C. § 702.

26          55.    This court has recognized Ms. Leigh's standing previously, to bring

27   actions against the inhumane treatment of wild horses. See generally,  *Leigh v. Salazar,*

28   3:10-cv-597 and *Leigh v. Salazar*, 3:11-cv-608 filed in this court. See also *Leigh v.*

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

1   *Salazar*, 677 F.3d 892 (9th Cir. 2012).

2   56.     Plaintiff is an award winning illustrator, journalist / videographer and report

3   on issues dealing with the American West.   Her published articles and video have

4   appeared in many venues including Horseback Magazine, KLAS-TV and CNN. Ms.

5   Leigh is President and founder of Wild Horse Education, a non-profit group devoted to

6   documenting, reporting to the public and advocating on issues involving wild horses no

7   public lands. See, www.wildhorseeducation.org.

8   57.     Ms. Leigh has been a horse owner and keeper for many years.   Ms.

9   Leigh is informed and believes she is reasonably informed on many issues involving the

10   care, maintenance and safety of horses including but not limited to matters involving

11   their physiology, structure, hoof care, feed and diet, diseases, conditioning, handling,

12   and their natural instincts, to name but a few.  Ms. Leigh has personally given medical

13   aid and attention to horses, treating such ailments or injuries involving, among other

14   conditions, leg injuries, digestive issues, colic, heat and hydration issues.  She has

15   taken care of foals with congenital anomalies.  She has treated and cared for horses

16   with metabolic and stress founder.   Ms. Leigh operated a home-based nursery for

17   wildlife rehab in conjunction with a county wildlife center where, during her tenure there,

18   the center maintained a zero percent death rate with over 100 orphans of varied

19   species of wildlife.

20   58.     Ms. Leigh has attended more BLM roundups the past thirty (30) months

21   than any BLM, DOI or other government personnel, any journalist, any photojournalist,

22   and any other member of the public, in her attempts at accurately documenting wild

23   horses in the wild, and in documenting the Defendants' management of wild horses.  In

24   the past two years Ms. Leigh filmed/recorded thousand of hours of video and has

25   amassed more than a hundred-thousand photos of wild horses on public lands.

26   59.     Ms. Leigh traveled nearly 200,000 miles since September 2010 to

27   observe and document wild horses and the BLM's management practices.  Ms. Leigh

28   has thus far, traveled in six states to accomplish this work, she visited and attempted to

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
© G.M. Cowan 2013
*All Rights Reserved*
www.cowanlaw.com

Page 29

visit multiple wild horse holding facilities operated or managed by the government. She

attended numerous Advisory Board meetings and also traveled to Denver, CO to

participate in what BLM referenced as a "workshop" toward "problem solving."  And, she

attended numerous meetings in BLM district offices, she attended RAC meetings

("RAC" is the BLM acronym for Resource Advisory Council) whenever opportunity

presents to provide public comment.

60.    Ms. Leigh has endured personal searches, vehicle and property searches,

road blocks, background checks, extreme temperatures from minus 10 degrees

Fahrenheit to over 100 degrees Fahrenheit, vehicle breakdowns in remote regions, all

in attempts at gaining access to view and observe and document wild horses on public

lands and at government wild horse facilities and during capture, corralling and

transportation for their removal from public lands.

61.    Ms. Leigh has endured death threats, discriminatory access, vandalism to

her personal property, significant wear and tear to her personal property, countless

hours of off-road travel and on-road travel, all in attempts at gaining access to view and

observe and document wild horses on public lands and at government wild horse

facilities and during capture for their removal from public lands.

62.    When not in the field, Ms. Leigh is conducting research on a multitude of

wild horse related topics particularly those involving public lands and interests that

compete with wild horses; she arranges for adoptions of wild horses captured by the

BLM from public lands and is responsible for having caused the adoption of a

significant percent of all horses adopted out by the BLM; Ms. Leigh is a regular

publisher of articles concerning the management of wild horses on public lands.

63.    Ms. Leigh's life is devoted to documentation and education of the care of

wild horse herds.  Ms. Leigh is dedicated to helping create reform where appearing

necessary, in the management of America's wild horses.

64.    As a documentarian and photojournalist Ms. Leigh is dedicated to creating

honest dialogue based on the truth about wild horses and burros on public lands; her

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 30

goal is to educate the public about wild horses on public lands, including educating on how wild horses live, thrive, survive, travel, their social order and interaction, how they become impacted by competing private and also public interests that affect their remaining habitat, how they are impacted by man and by those charged with the responsibility of protecting them, who, in this instance, are the Defendants herein.

65.    As a documentarian and a current historian of America's wild horses, Ms. Leigh has gained a deep appreciation of, and respect for, wild horses, not just for a particular horse or two, nor in a general sense toward all wild horses, but rather, to certain groups of horses, certain herds exhibiting genetic similarities within defined geographical regions, and to certain herds of horses who thrive viably where the BLM has had little involvement, and with specified groups or families of wild horses who thrive and interact in a dynamic social order among themselves as particular herds in certain remote regions within public lands, and which Ms. Leigh photographed or documented multiple times in the past and also recently, and with whom Ms. Leigh spent countless hours and days visiting, watching, appreciating and understanding while observing them in their environment, on rangelands comprising public lands managed by the Defendants.

66.    Ms. Leigh maintains significant history with the Owyhee Complex horses and the issues surrounding the management of wild horses at the Owyhee Complex. Ms. Leigh filed suit previously in this court in 3:10-cv-597 where the Hon. Larry Hicks agreed with Ms. Leigh when finding the blanket closure of public lands during roundup activities occurring there in the summer of 2010, violated First Amendment notions. Judge Hicks allowed an emergency roundup based on perceived drought conditions to continue. BLM claimed at the time, the Owyhee horses were in such degraded condition that 75 percent of the population would expire in three days' time if not immediately removed. With this unprecedented assertion, the court allowed the removal of those horses on an emergency basis. BLM allowed no independent or public confirmation or observation of a single horse rounded up in Owyhee in 2010 and

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 31

1    intentionally chose private land to place its traps and alerted the Sheriff to arrest those

2    who trespassed on private land if public observers attempted to independently view the

3    capture of these horses. And, an independent range expert who visited the same area

4    immediately following the conclusion of the Owyhee 2010 roundup, where the purported

5    "drought emergency" existed, found no evidence of a drought emergency and instead,

6    found normal range conditions for that time of year. Meanwhile, not a single horse

7    perished at Owyhee in 2010 until the BLM commenced its roundup. And several horses

8    perished when the BLM engaged the roundup process.

9         67.    The foregoing paragraph is significant where the defendants employ the

10   identical trap for the Owyhee roundups commencing January 4, 2013 as was used in

11   the controversial Owyhee 2010 roundup. The BLM is using this identical trap as its only

12   trap for the entire Owyhee HMA, meaning, horses that BLM, once again contends,

13   show signs of significant impact from drought conditions, would be driven as much as

14   25 miles to this single trap location. Plaintiff is informed and believes this circumstance

15   would place those wild horses in harm's way and those horses would not be humanely

16   managed when having to travel such a distance in winter conditions.

17        68.    As a consequence of no corrective action having been taken at Owyhee

18   Complex roundups thus far, Ms. Leigh finds herself in a position without remedy or

19   recourse, to stop further acts of inhumane conditions and methods toward those wild

20   horses at the Owyhee Complex. Ms. Leigh' only apparent avenue of relief is through

21   assistance of this court with this suit, to halt further inhumane treatment of Owyhee

22   Complex wild horses.

23        69.    Ms. Leigh engaged the BLM on the inhumane issues raised by this suit, at

24   this roundup, in the avenues open to her. Ms. Leigh commented on the Preliminary EA.

25   She commented at the RAC meeting. She wrote letters. She disclosed her

26   documentation to the public and encouraged the public to write as the Owyhee

27   Complex roundups continued with instances of inhumane conditions and methods

28   remaining uncorrected.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 32

70.     Ms. Leigh's repeated attempts at addressing the inhumane conditions and methods remaining uncorrected at the current Owyhee Complex roundups, caused the BLM to publish an open letter naming Ms. Leigh's organization, Wild Horse Education, on the BLM's roundup update web page. The BLM's open letter does not address Ms. Leigh's concerns and instead, denies wrongdoing.

71.     Understanding that she as but a mere citizen having no other recourse whatsoever to act when an agency who operates with broad discretion, contrary to laws, where the activity or inaction causes her harm as averred herein, Plaintiff is compelled to bring the improper conduct to the attention of the courts, to ask for the court's help, to stop and enjoin further inhumane conduct toward the Owyhee Complex wild horses during the BLM's described processes, and to prevent her further perceptible harm.

72.     Plaintiff is informed and believes she maintains a right to seek judicial review of agency action (or lack of action) under the Administrative Procedure Act, which allows a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review.  5 U.S.C. § 702.

73.     Plaintiff is informed and believes she suffered and continues to suffer an invasion of a legally protected interest amounting to the harms as averred herein, caused when she is compelled, time and time again, to watch the Defendants engage Owyhee Complex wild horses with inhumane methods and conditions, contrary to laws and policies of the United States;  that Ms. Leigh maintains a right to observe the *humane* removal of Owyhee Complex wild horses from public lands.

74.     Plaintiff is adversely affected and aggrieved where she suffers perceptible harm which is imminent and continuing when having repetitively been subjected to observations of inhumane treatment toward Owyhee Complex wild horses and which she would likely observe with ongoing Owyhee Complex roundups; that the offending conduct is within the zone of interest contemplated by Congress which clearly calls for the *humane* removal of excess wild horses.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

75.     Plaintiff is informed and believes her perceptible harm is:  concrete and particularized, and imminent, and not conjectural or hypothetical, that there is a causal connection between her perceptible harm and the conduct complained of, and that the continuing threat of such perceptible harm to her person would be redressed with the imposition of temporary, preliminary and permanent injunctive relief as requested herein.

76.     Plaintiff is informed and believes her requested relief is traceable to the Defendants' practice of ignoring the expressed intent of Congress when Congress unanimously adopted the Wild Free-Roaming Horses and Burro Act 16 U.S.C. §1331 *et seq.*, where Congress unambiguously requires the Defendants to remove excess horses *humanely*.  See, 16 USC § 1333 (b)(2)(iv)(B) (as amended in 1978).  That the "humane" handling of free-roaming wild horses when removing their excess brethren, is part and parcel with the Wild Horse and Burro Act and is stated in mandatory, not permissive terms. 16 USC § 1333 (b)(2)(iv)(B).  [See also, 16 U.S.C. § 1338a (the use of helicopters, "shall be in accordance with *humane* procedures . . . ."), 16 U.S.C. §1333(c)(calling for "humane conditions" by adopters), 1338(a)(3)(criminal penalty for "maliciously causes the death or harassment  of any wild free-roaming horse or burro") and §1338(a)(6) (willfully violates a regulation issued pursuant to the Wild Free-Roaming Horse and Burro Act)].  Plaintiff is informed and believes the Wild Free-Roaming Horse and Burro Act remains clear, cogent and unambiguous in regard to the mandatory *humane* handling of wild horses by the Defendants during their removal of excess horses.

77.     That the definition of what the United States considers "humane" and also "inhumane" is specifically referenced at 43 CFR § 4700.0-5.  Plaintiff is informed and believes the Defendants' conduct as described and identified herein and elsewhere in support of her requested injunctive relief, is in contradiction to that considered "humane" as defined in 43 CFR §4700.0-5,  and is "inhumane" as that term is described in 43 CFR §4700.0-5; and further, such conduct by the Defendants is against all

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1   reasonable notions of what groups of reasonable people would consider as being

2   "humane;" and such conduct is further inhumane as that term is contemplated within

3   the laws of the State of Nevada.

4       78.   Plaintiff has no other avenue of recourse but to seek injunctive relief in the

5   courts when the Defendants repeatedly choose not to follow and enforce the laws of the

6   United States with regard to the humane removal of excess wild horses from public

7   lands, and where they intend to remove horses not considered excess horses from

8   public lands, and which conduct causes Plaintiff a perceptible harm as averred herein.

9                               **DEFENDANTS**

10      79.   The named Defendants collectively comprise the governing authorities of

11  the United States of America responsible for managing certain public lands in the

12  United States.  The U.S. Department of Interior is a cabinet-level agency headed by Mr.

13  Ken Salazar. The BLM is a U.S. Department of Interior "bureau" headed by Mr.  Mike

14  Pool as its Acting Director. Ms. Amy Lueders is the BLM's Nevada State Director.  The

15  individuals are sued only in their official capacity as those most senior in decision-

16  making processes and responsible for their respective governing  agency / bureau /

17  department. Plaintiff is informed and believes the BLM manages 47 million acres of

18  public land in Nevada, accounting for more than 80 percent of Nevada's land mass.

19                          **GENERAL ALLEGATIONS**

20      80.   The Owyhee comprises in excess of one million acres. The roundup area

21  is larger and includes more than two million acres, crossing two counties, Elko and

22  Humboldt. Complaint, Exhibit 1, EA, ¶ 3, p.1.

23      81. Although the opening section of the EA indicates roundups would last 45

24  days, the EA, in truth, contemplates and incorporates a ten (10) year roundup removal

25  plan. Exhibit 1, EA, 4th ¶, p.16;  ¶ 5, p.18; ¶ 2, p.19.

26      "Maintenance gathers to reapply fertility control and to remove adoptable

27      wild horses would be conducted for the next 10 years following the date of

28      the decision."  Exhibit 1, EA, 4th ¶, p.16.

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 35

82.     All wild horses in the Owyhee Complex are managed by BLM.  The BLM defines "excess" horses as a population which exceeds in number, that which the BLM invented and coins "appropriate management level" or "AML."  The BLM recently reformulated "AML" into a variable range, from a "high AML" to a "low AML." The Owyhee Complex roundups in this instance strictly target "low AML." Exhibit 1, EA, ¶ 5, p.18; ¶ 2, p.19.  And, Exhibit 1, EA, ¶ 2.6.3, p.21.  BLM defines "AML" as follows:

> [t]he number of horses that can be sustained within a designated HMA
> which achieves and maintains a 'thriving natural ecological balance' in
> keeping with the multiple use management concept for the area.
>
> Exhibit 1, EA, 4th ¶, p.3.

83.     Plaintiff is informed and believes, according to BLM assertions, the low range of AML is the *minimum* herd population level for a given HMA. The high range AML is the maximum population level that will help to prevent further deterioration of the range and achieve and maintain a "thriving natural ecological balance" and multiple use relationship. Plaintiff is informed and believes "low AML" represents a fictional and flawed method of determining excess wild horses, not justified by law.

84.     The roundup scheduled to commence January 4, 2013 of the 50 horses the BLM seeks to remove from the Owyhee HMA, is not justified. The original removal of horses from this specific area, absent a modified drought emergency, was slated to be only 11 horses. This sum was increased from 11 horses to 50 horses when the BLM posted an update to the roundup schedule. The stated reason for the increase in removed horses is because of severely limited water resources. But, the "severely limited water conditions" is a condition that no longer exists. The BLM update states in relevant part, the following:

> The Bureau of Land Management today announced updates to its
> tentative fall-winter schedule for gathering wild horses and burros from
> overpopulated herds on drought- stricken Western public rangelands.
> Changes from the previous gather schedule reflect a re-prioritizing of

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 36

1  gathers based on drought and, in some cases, animal conditions that

2  have been affected by diminishing forage and water across the West.

3                                    * * *

4  The gather of Owyhee Herd Management Area in Nevada will seek to

5  remove 50, rather than 11, horses because of severely limited water

6  sources.                                    See BLM Update, **Exhibit 2**, attached.

7  Plaintiff is informed and believes the BLM update was posted when in fact, there was a

8  drought emergency or severely limited water resources; such conditions no longer

9  exists following several storms or after December 6, 2012 when the range was flooded

10 and became saturated by multiple rain storms. The roundup of horses beyond 11

11 horses, beginning January 4, 2013, is clearly not justified where these horses, beyond

12 11, would not be excess horses.

13         85.    Plaintiff seeks to enjoin, not the roundups themselves, but the inhumane

14 conduct occurring at these roundups that has now become the BLM's "norm."

15         86.    In 1971 the Wild Horse and Burro Act passed unanimously in both houses

16 of Congress and was signed into law December 1971 by President Nixon. The purpose

17 of the act was to protect wild horses found on federal public lands. The Congressional

18 findings and declaration of policy of the Act are as instructive. They are as follows:

19                  Congress finds and declares that wild free-roaming horses

20                  and burros are living symbols of the historic and pioneer

21                  spirit of the West; that they contribute to the diversity of life

22                  forms within the Nation and enrich the lives of the American

23                  people; and that these horses and burros are fast

24                  disappearing from the American scene. It is the policy of

25                  Congress that wild free-roaming horses and burros shall be

26                  protected from capture, branding, harassment, or death; and

27                  to accomplish this they are to be considered in the area

28                  where presently found, as an integral part of the natural

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

1    system of the public lands.

2                    The Wild Free-Roaming Horses and Burro Act of 1971,
                    P.L.92-195, 16 U.S.C. §  1331.
3

4    87.    Congress defines the powers and duties of the Secretary of the Interior,

5    relative to the management of wild horses on public lands, in Section 1333 of the Act.

6    That Section defines by mandatory language the Secretary's obligation to *humanely*

7    capture certain wild horses.  Section 1333 provides in relevant part, that the removal of

8    excess horses from public lands,

9                    [s]hall be taken, in the following order and priority until all

10                   excess animals have been removed so as to restore a

11                   thriving natural ecological balance to the range, and protect

12                   the range from the deterioration associated with

13                   overpopulation:

14                                    *  *  *

15            (B)    **The Secretary shall cause such number of**

16                   **additional excess wild free-roaming horses and**

17                   **burros to be humanely captured** and removed for

18                   private maintenance and care for which he

19                   determines an adoption demand exists by qualified

20                   individuals, and for which he determines he can

21                   **assure humane treatment** and care (including

22                   proper transportation, feeding, and handling) . . . .

23                    16 USC 1333 (b)(2)(iv)(B) (Emphasis Added).

24    88.    Plaintiff had been an observer at Owyhee Complex roundup operations

25    from November 27 through December 15, 2012. Although her access is customarily

26    unduly and unreasonably restricted, she nevertheless observed several examples of

27    inhumane conditions and methods in the process of capturing, corralling and

28    transporting wild horses. Those specific instances of conduct are described in

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 38

paragraph 11 above, at pp. 5-6, and are described in detail in the Declaration of Laura Leigh at **Exhibit 3**.

89.   Plaintiff was not the only observer who witnessed these incidents repetitively. See Declaration of Keegan Kuhn at **Exhibit 4** which outlines Mr. Kuhn's observations of inhumane conditions and methods ongoing at the Owyhee Complex roundups.

90.   Another observer present during some of the Owyhee Complex roundups, likewise became offended at viewing the same inhumane conditions and methods. See Declaration of Stephanie Martin at **Exhibit 5** which outlines Ms. Martin's observations of inhumane conditions and methods ongoing at the Owyhee Complex roundups.

91.   43 CFR § 4700.0-5 provides in relevant part, as follows:

(e)   Humane treatment means handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro.

(f)   Inhumane treatment means any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community.

92.   As of this writing, due to the holidays, Plaintiff had not yet received Declarations from respectable veterinarians who intend to provide support confirming that the observed conditions and methods are not "humane" toward those wild horses. Plaintiff asks leave of court to supplement the complaint and any motion to include such Declarations.

93.   The BLM's own EA for the Owyhee Complex roundups provides as follows:

The primary concern of the contractor is the safe and humane handling of all animals gathered.                                    Exhibit 1, Appendix A, p.132.

94.   The  BLM's own EA for the Owyhee Complex provides as follows:

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

The COR would coordinate with the contractor and the BLM
Corrals to ensure animals are being transported from the gather site in a
safe and humane manner and are arriving in good condition.

The contract specifications require humane treatment and care of
the animals during removal operations. These specifications are designed
to minimize the risk of injury and death during and after gather of the
animals. The specifications would be vigorously enforced.

Should the Contractor show negligence and/or not perform
according to contract stipulations, he would be issued written instructions,
stop work orders, or defaulted.

Exhibit 1, Appendix A, p.138.

95.    43 CFR § 4740.1 provides in relevant part, the following:

[a]ircraft may be used by the authorized officer

in all phases of the administration of the Act, .

. . All such use shall be conducted in a

humane manner.

43 CFR § 4740.1.

96.    16 U.S.C. § 1338a  likewise provides in relevant part as follows:

In administering this Act [16 USCS §§ 1331 et

seq.], the Secretary may use or contract for the

use of *helicopters*. . . .  Such use shall be

undertaken only after a public hearing and

under the direct supervision of the Secretary or

of a duly authorized official or employee of the

Department. . . .  *Such use shall be in*

*accordance with humane procedures*. . . .

16 U.S.C. § 1338a.

**FIRST CLAIM FOR RELIEF**

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

97.     Plaintiff incorporates by reference the averments contained in Paragraphs 1 through 96 of the Complaint as though the same were fully set forth herein.

98.     Plaintiff is informed and believes the Defendants' roundup methods at Owyhee Complex are "inhumane" and contrary to the clear intent of Congress when passing The Wild Free-Roaming Horses and Burro Act of 1971,  16 U.S.C. §1331 *et seq.*, which governs the conduct of such activities on BLM-managed lands; that the methods employed in handling wild horses removed from Owyhee are contrary to, and deviate from, the policies of the United States, that they are contrary to, and deviate from the laws of the United States and the Code of Federal Regulations, and particularly contrary to the following provisions:

a.     16 U.S.C. §1333 (b)(2)(iv)(B);

b.     16 U.S.C. §1338a;

c.     43 CFR §4740.1;

d.     43 CFR §4700.0-5(e), (f),

and hat the roundup methods and conditions employed by the BLM at the Owyhee Complex contravene the Defendants' own stated, publicized policies with respect to the humane management and care of wild horses removed during such roundup, as is stated in the BLM's own published EA.

99.     That the Defendants maintain authority to enforce the humane laws of the United States, and they maintain authority to correct or to modify or to stop the contractor's work in this very instance, to cause compliance with such humane laws, policies and regulations;  that the failure to enforce such laws and provisions is an abuse of discretion that causes Plaintiff's harm as averred herein.

100.     That the Defendants' failure and/or refusal to act to enforce the humane laws of the United States as indicated herein, is in fact, agency action defined at  5 U.S.C. §551(13) (a failure to act), that is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, and/or is agency action implemented without observance of procedure required by law, as is contemplated in

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

the Administrative Procedures Act,  5 U.S.C. §§706(2)(A) and/or (D).  And such failure
to act causes Plaintiff's harm as averred herein.

101.   Plaintiff is informed and believes she maintains standing under 5 U.S.C.
§702 of the Administrative Procedures Act to seek judicial review of the Defendants'
action (or failure to act) where she has suffered and would continue to suffer actual
injury or injury in fact that is within the zone of interests protected by the relevant federal
statutes indicated herein above, which Defendants fail and refuse to enforce or correct.

102.   Plaintiffs' actual injury, injury in fact and harm includes but is not limited to
harm to her personal aesthetic interests when observing the brutality of the inhumane
method the Defendants systematically employ when capturing, handling and removing
wild horses. As one familiar with horses, Ms. Leigh does not have a reasonable or valid
explanation to herself, for the dichotomy between having personally viewed in one
aesthetic sense, the freedom wild horses in this region experience when roaming free
and peacefully in their native habitat, with the aftermath she observed where wild
horses are subjected to undeserved inhumane treatment by the very agency left in
charge of their safe keeping.  That Ms. Leigh's personal, internal lack of validation or a
reasonable explanation for such inhumane treatment results in a gnawing, depressing,
confusing and sobering look into the dark side of humanity that disturbs the senses and
destroys all notions of aesthetic appreciation the Plaintiff otherwise would enjoy when
observing Owyhee Complex horses roaming free in peaceful, dynamic social order. Ms.
Leigh suffers harm to her personal well being where she is physically sickened in
having observed repetitive inhumane acts towards wild horses. Ms. Leigh suffers harm
to her personal well being and to her mind's soul amounting to anxiety, trepidation,
grief, chagrin, and a shock to the senses, which she must relive in both her conscious
mind and also at an unconscious level when experiencing nightmares, from having
personally witnessed the inhumane conditions and methods employed at these
roundups. Ms. Leigh. is informed and believes that these personal harms and other
harms, establish the requisite concrete and particularized injury to her personal

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 42

interests.

103.    Plaintiff plans to observe most of the Defendants' remaining roundup operations at the Owyhee Complex. Plaintiff accordingly could reasonably expect that she would continue to suffer the same harm as referenced herein, at remaining Owyhee Complex roundups where the Defendants refuse corrective action.

104.    As of this writing, Plaintiff is informed and believes the Defendants have not engaged in any corrective efforts to ensure such inhumane conduct is not repeated at future roundups at Owyhee Complex roundups.

105.    There remains a real and immediate threat that the injuries to Ms. Leigh's personal interests as herein described would repeat and reoccur where she would likely be present at remaining Owyhee Complex roundups.

106.    A ruling in Plaintiff's favor would likely address and resolve the Plaintiffs' harm that would not likely occur except with assistance from the court.

107.    That the Defendants' arbitrary and capricious action, its abuse of discretion, its conduct not in accordance with law, and its action implemented without observance of procedure required by law, relevant to the Defendants' refusal to enforce humane laws and policies of the United States during the Owyhee roundup, is the direct and proximate cause of the Plaintiff's harm as described herein

108.    The harms to Ms. Leigh as are more particularly described herein are irreparable.  The Defendants' conduct in refusing to take corrective action disturbs the senses of reasonable people including Ms. Leigh, and causes further irreparable harm to Ms. Leigh.  Such inhumane conduct is intolerable, it is shocking to the conscience of reasonable persons including Ms. Leigh, and such inhumane conduct is unlawful and unnecessary.  There is no measure of damages and no action at law available to Ms. Leigh which can account for the personal, irreparable loss to Ms. Leigh as heretofore mentioned.  Ms. Leigh has no other remedy available to her in seeking a remedy to stop the harmful conduct.  Without the help of this court, she finds herself without remedy and without justice.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

109.   Ms. Leigh is further harmed by the fact that the actions are condoned and carried out by her government. Ms Leigh's very pride and identity as an American is offended by the actions of this agency. That this agency would be permitted to inhumanely treat a symbol of American freedom is appalling to her.

110.   For the reasons outlined herein, the Defendants should be temporarily restrained and preliminarily and permanently enjoined from allowing inhumane methods and conditions to remain in place, unchecked and without correction, as is previously described herein, during the Defendants' completion of the Owyhee Complex roundups.

### SECOND CLAIM FOR RELIEF

111.   Plaintiff incorporates herein by reference the averments contained in Paragraphs 1 through 110 of the Complaint as though the same were fully set forth herein.

112.   A controversy exists between Plaintiff and Defendants relative to the Defendants' inhumane management of wild horses on public lands as described herein.

113.   Plaintiff seeks a declaration that proclaims cessation of all forms of inhumane treatment as identified herein and in accompanying injunctions, and which requires the Defendants to enforce humane provisions of the laws of the United States as is so required, to prevent further harm to Plaintiff as described herein.

114.   Plaintiff seeks a declaration that proclaims that the absence of a specific humane care policy or policy implemented by the Defendants has caused inhumane treatment of wild horses at Owyhee Complex roundups, and has caused Plaintiff harm.

115.   Plaintiff seeks a declaration that the conditions and methods causing inhumane treatment toward wild horses during the Owyhee Complex roundups, remaining uncorrected, is arbitrary and capricious, and results in an abuse of discretion, or otherwise involves activity not in accordance with law, and that the plan is implemented without observance of procedure required by law.

116.   Plaintiff seeks a declaration that the Defendants' action as currently implemented, results in inhumane treatment toward horses, that the Defendants' action

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 44

is accordingly, arbitrary and capricious, and results in an abuse of discretion, or otherwise involves activity not in accordance with law, and that the plan is implemented without observance of procedure required by law.

117.    Plaintiff seeks a declaration that the Defendants' choice of action as is displayed at the Owyhee Complex as averred herein, violates laws of the United States, in particular the following:

        a.    16 U.S.C. §1333 (b)(2)(iv)(B);

        b.    16 U.S.C. §1338a;

        c.    43 CFR § 4740.1;

        d.    43 CFR §4700.0-5(e), (f).

118.    Plaintiff seeks a declaration that plaintiff maintains standing to bring both injunctive relief and also declarative relief as averred herein, that she suffers irreparable harm, that the issuance of such relief is in the public's interest as well as in Ms. Leigh's interests.

### THIRD CLAIM FOR RELIEF

119.    Plaintiff incorporates herein by reference the averments contained in Paragraphs 1 through 118 of the Complaint as though the same were fully set forth herein.

120.    The defendants should have considered but failed to consider before finalizing the EA, those matters averred in paragraphs 11-13, 15-16, 18-28 and 32-33 herein.

121.    In failing to consider the foregoing before finalizing the EA, the defendants' action is "not in accordance with law," or is arbitrary and capricious, or implemented without observance of procedure required by law.

122.    The defendants' action which causes wild horses to be unnecessarily and unlawfully removed from Snowstorm HMA in violation of law and where the defendants refuse to implement corrective action, disturbs the senses of reasonable people including Ms. Leigh, and causes further irreparable harm to Ms. Leigh. There is no

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

Page 45

1  measure of damages and no action at law available to Ms. Leigh which can account for

2  the personal, irreparable loss to Ms. Leigh as heretofore mentioned.  Ms. Leigh has no

3  other remedy available to her in seeking a remedy to stop the harmful conduct.  Without

4  the help of this court, she finds herself without remedy and without justice.

5  123.    For the reasons outlined in paragraphs 11-13, 15-16, 18-28 and 32-33

6  herein, the Defendants should be temporarily restrained and preliminarily and

7  permanently enjoined from proceeding with the bait/water trap roundups at Snowstorm

8  HMA.

9  124.    Because the plaintiff may reasonably expect that the same agency

10  conduct would likely repeat in other areas of the Owyhee Complex during the ten-year

11  EA as that outlined in paragraphs 11-13, 15-16, 18-28 and 32-33, and which also

12  causes inhumane methods and conditions to occur, and which causes roundups to

13  occur based on no information or mis-information or inaccurate or non-valid data,

14  plaintiff avers that the Defendants should be temporarily restrained and preliminarily

15  and permanently enjoined from proceeding with further roundups during the ten-year

16  EA, within the Owyhee Complex until after the defendants conduct appropriate studies

17  and obtain valid, current data. Alternatively, Plaintiff requests she be allowed to file

18  temporary restraining orders on a case by case basis without having to amend the

19  complaint on each occasion where new roundups that are based on defective or

20  unlawful decisions or actions, are announced during the remaining ten-year EA and

21  occurring within the Owyhee Complex.

22  **FOURTH  CLAIM FOR RELIEF**

23  125.    Plaintiff incorporates herein by reference the averments contained in

24  Paragraphs 1 through 124 of the Complaint as though the same were fully set forth

25  herein.

26  126.    The conduct as described herein in paragraphs 34 and 35 is an unlawful

27  violation and infringement on the Plaintiff's First Amendment right of access and as a

28  press member, to her freedom of the press, to observe and then report government in

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 46

action on matters involving activities garnering passionate public interest.

127.   Plaintiff is informed and believes the methods to be employed to roundup wild horses at the Owyhee Complex and particularly those that would use the methods proposed at the Snowstorm HMA via bait / water trap method, that were cancelled, are intended to, and in fact violate plaintiff's First Amendment constitutional right to observe government activity; that open government has been a hallmark of America's democracy since its founding;

128.   The First Amendment prohibits any law "abridging the freedom of speech, or of the press [.]" U.S. Const. amend. I. Although the First Amendment does not enumerate special rights for observing government activities, "[t]he Supreme Court has recognized that news gathering is an activity protected by the First Amendment." *United States v. Sherman,* 581 F.2d 1358, 1361 (9th Cir.1978); see *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); and plaintiff is a newsgatherer who reports her observations of the management of wild horses to the public; and as a member of the public and the press, and is credentialed press.

129.   Plaintiff maintains a qualified right of access to observe and report government activities which, in this instance, the defendants intend to unconstitutionally restrict with intended operations at the Owyhee Complex, the Snowstorm HMA, in particular.

130.   Plaintiff is informed and believes wild horse roundups in the Owyhee Complex area have historically been open to the press and general public even long before the Wild Horse and Burro Act was passed into law in 1971. Plaintiff is informed and believes public access plays a significant positive role in the proper and reasonable functioning of wild horse management and roundups on and around public lands; that transparency with the public (or the lack thereof) in this very process was considered key in findings within the NAS study, where the term "transparency" when referencing the pubic's participation is cited no less than 46 times. Plaintiff asks that the court allow

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 47

its filing, to take judicial notice of the NAS report as an official, government authorized

report following a requested study or investigation made pursuant to authority granted

by the defendants according to law. If the NAS report is not filed with this pleading, the

plaintiff has no objection to the court considering the NAS report as one outside the

pleadings, if not made part of the record.

131.   Plaintiff is informed and believes the blanket preclusion and denial of

access to the public and to plaintiff during the bait trap operations intended by the

defendants, unconstitutionally restricts plaintiffs' right of access in contravention of First

Amendment constitutional principals. As a member of the press, the defendants' denial

of Plaintiff to access to observe and report what occurs relative to the defendants work

while handling or managing public resources, wild horses in this instance, particularly

where access had not been denied historically, that to do so now unreasonably and

unconstitutionally restricts plaintiffs' right of access as a public person and also as a

member of the press, in contravention of First Amendment constitutional principles; and

which effectively prevents her from adequately photographing and using same to report

to this court and to the public, the conduct of the defendants when engaged in such

activities, and the probable resulting inhumane consequences of such activities. Plaintiff

is informed and believes she is entitled, as credentialed press and also as a member of

the public, to observe and report the government's activities as it relates to the

roundups anticipated, that such activity is newsworthy; that Plaintiff maintains a

constitutional right to gather such news; that the rounding up of wild horses from public

lands managed by the defendants garners passionate public interest; that as a

consequence of the defendants' method of precluding the public from observing and

from having access to observe the defendants' activities, plaintiff is precluded from

obtaining the very proof that may be necessary via photographs and video, to observe

and report this very government activity, to observe and report inhumane conduct

should it occur, and to observe and report the consequences of the defendants'

activities, whether good or bad.

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

132.    Plaintiff would also suffer irreparable harm where she is precluded from observing and reporting in the ordinary course, the government agency's activities in managing, rounding up, corralling, handling, temporarily holding, warehousing and transporting wild horses intended to be removed from public rangelands at bait trap operations at the Owyhee Complex, the Snowstorm HMA in this instance.

133.    The defendants' intended preclusion of plaintiff from observing roundup activity is agency action contrary to constitutional right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment and relief as against all Defendants, as follows:

*Injunctive Relief*

1.    *Inhumane Issues* - A mandatory or prohibitive injunction issue preliminarily and permanently precluding the Defendants from allowing inhumane methods and conditions to exist during the Owyhee Complex roundups including the capture moments, corralling, holding, transportation and shipping of wild horses as are described herein, to compel enforcement of humane laws of the United States and to compel immediate correction of inhumane methods and conditions as they are observed and which could be anticipated at Owyhee Complex roundups during the ten-year EA;

2.    *Owyhee Complex Roundups Anticipated During Ten-Year EA* - A mandatory or prohibitive injunction issue preliminarily and permanently precluding the Defendants from proceeding with Owyhee Complex roundups, for those reasons indicated at paragraphs 11-13, 15-16, 18-28 and 32-33 herein, until such time as defendants obtain competent, relevant and timely data and them implement a course based on such competent, relevant and timely data, on the subjects indicated at paragraphs 11-13, 15-16, 18-28 and 32-33 herein.

3.    *First Amendment Concerns* - A mandatory or prohibitive injunction issue preliminarily and permanently,

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 49

a.   precluding the Defendants from, proceeding with the Snowstorm HMA roundup for those First Amendment concerns indicated at paragraphs 34 and 35 herein and also in the plaintiff's Fourth Claim for Relief, paragraphs 125 through 132 herein;

b.   mandating and allowing and accommodating the public and plaintiff in a reasonable manner, to observe captures of wild horses in bait / water trap operations intended for the Snowstorm HMA, and in so doing, to require the same public access to observe the bait / water trap captures of wild horses as were completed successfully in other BLM districts, namely the following locations:

I.    The BLM Elko, Nevada District for the Maverick - Medicine HMAs which allowed public access to observe bait / water trap operations there earlier this month, August 2013;

II.   The BLM Carson, Nevada District for the Deer Run HMA which allowed public access to observe bait / water trap operations there earlier this year;

III.  The BLM Billings, Montana field office encompassing the Prior Mountains which allowed public access to observe bait / water trap operations there August 2012;

c.   A mandatory or prohibitive injunction issue preliminarily and permanently precluding the defendants from interfering with the plaintiffs constitutional right of access to observe and report government activity during roundups at the Owyhee Complex during the ten-year EA whether by bait trapping and precluding the public there, or by other means meant to remove plaintiff's and others' observation of the government's activities;

4.   A declaration that the Defendants' action as currently intended at the Owyhee Complex roundups, would result in inhumane treatment toward wild horses, that the Defendants' action is accordingly, arbitrary and capricious, and results in an abuse of

Cowan Law Office
P.O. Box 17952
Reno, NV 89511
© G.M. Cowan 2013
All Rights Reserved
www.cowanlaw.com

discretion, or otherwise involves activity not in accordance with law, and that the Defendants' action is without observance of procedure required by law.

5.      A declaration that the Defendants' current plan as currently contemplated violates laws of the United States, in particular the following:

        a.      16 U.S.C. §1333 (b)(2)(iv)(B);

        b.      16 U.S.C. §1338a;

        c.      43 CFR 4740.1;

        d.      43 CFR 4700.0-5(e), (f).

6.      A declaration that plaintiff maintains standing to bring both injunctive relief and also declarative relief as averred herein, that she suffers irreparable harm, that the issuance of such relief is in both hers and the public's interest.

7.      A declaration that the conditions and methods of rounding up, capturing, corralling and loading wild horses at Owyhee Complex as described herein, are inhumane and thus violate policies and laws of the United States.

8.      A declaration that the absence of a specific humane care policy or policy implemented by the Defendants has caused inhumane treatment of wild horses at Owyhee Complex roundups, and has caused Plaintiff harm.

9.      That the Court award Plaintiff:

        a.      her costs of suit and expenses including expert witness and consultant fees and reasonable attorney's fees; and

        b.      such other and further relief as the Court deems appropriate under the circumstance.

Dated August 21, 2013

                        LAW OFFICE OF GORDON M. COWAN

                              s/

                       _____

                       Gordon M. Cowan Esq. (SBN 1781)
                       Attorney for Plaintiff LAURA LEIGH

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*

Page 51

**Exhibits**

Exhibit 1:  BLM's Final Environmental Assessment for the Owyhee Complex
Exhibit 2:  BLM Posted Update
Exhibit 3:  Declaration of Laura Leigh
Exhibit 4:  Declaration of Keegan Kuhn
Exhibit 5:  Declaration of Stephanie Martin
Exhibit 6:  Drought Monitoring Report (by Ms. Leigh for Wild Horse Education)

*Cowan Law Office*
*P.O. Box 17952*
*Reno, NV 89511*
*© G.M. Cowan 2013*
*All Rights Reserved*
*www.cowanlaw.com*